Good morning, all. The first case for argument this morning is Werner v. Wall. Mr. Paul. Good morning, and may it please the Court. Patrick Werner was jailed 378 days for being in unusual punishment, and it violated due process. Mr. Werner reached his mandatory release date on March 21, 2010. At that point, the law required his release from incarceration whether or not he had a suitable home. The Wisconsin Court of Appeals had made this clear in Olson and in Allen. Following this Court's decision in Campbell, the Court made it clear that to incarcerate someone beyond his mandatory release date violates the Eighth Amendment if it's done without penological justification and with deliberate indifference to the requirements of state law. Now, the state argues, of course, that Mr. Werner was released. He was released from a DOC institution and transferred to a county jail on a parole hold. But with respect to the state, that argument makes a mockery out of Wisconsin's mandatory release statute. The Wisconsin Court of Appeals held in Olson that the DOC has no authority to hold an inmate in custody beyond his mandatory release date whether or not he has a suitable home. And in Reich, the Wisconsin Supreme Court made clear that this was true regardless of the incarceration. There, the Court said, in the context of someone who had been transferred from a DOC institution to a county jail on a parole hold, just like here, that the DOC cannot indefinitely hold an offender simply because he does not have a home. So then the question becomes, does it make a difference that Mr. Werner was allowed out into the community for four hours a day to look for a house? And I submit to you that it doesn't and that no reasonable DOC official could conclude that it did. In the Wisconsin Court of Appeals case of Woods, the offender was transferred to a minimum security facility and there allowed to go out into the community under the supervision of his parole agent. He was allowed to go to the bank, to get a state ID, even apply for a job, but he was not released entirely because he did not have a home. And he argued that throughout this time he remained a prisoner, incarcerated. And the Court agreed. It said it was inconsequential that he had been permitted to go out into the community, that he remained a prisoner because, quote, he was deprived of his liberty and held in custody. Like Mr. Woods, Mr. Werner was never released in any meaningful sense. He spent at least 148 out of 168 hours a week behind bars. And while behind bars, he could not possess such common items as a bowl and a spoon. He had to wear a jail uniform and he faced the prospect of lockdown for such minor infractions of jail rules as possessing a ripped bath towel. And when he was let out for those four hours, he was trailed closely by a chaperone and forbidden from accepting employment, which only made it more difficult to find a home because some apartments would not let to him if he did not have a job, but he could not get a job because he was incarcerated. And at the end of the four hours, he was cuffed, patted down, rebooked, and forced to change back into a jail uniform. This nowhere came close to approximating the conditions he would have experienced had he actually been released on supervised release. There, he would not have been behind bars and he would have been able to accept employment. In fact, under his rules of supervision, he was required to seek employment. Mr. Paul, could I ask you to address, with respect to the qualified immunity issues, the problems faced by the line officers? I understand your argument with respect to those who issued the policies under which Mr. Werner was held in the jail 20 hours a day, but what were the line officers and their immediate supervisors supposed to do, given the Department of Corrections policy that was in place? Two things. One, the policy, which is ADO-210, it's at Short Appendix 34, was discretionary. It says that homeless sex offenders may be detained, not that they shall be detained. And in fact, the DOC knew how to use the word shall because ADO-210 is replete with the word shall, but not in the crucial sentence it says they may be detained. So they were incarcerating him pursuant to a discretionary policy and that shows a level of intentionality that is relevant for the delivery. Mr. Paul, following up on Judge Hamilton's question, were the line officers in a position to exercise that discretion? I appreciate your point about discretion. I don't disagree that it was harder for the line officers. They were in a difficult spot. I don't disagree with that. But nevertheless, they're charged with following clearly established law. And clearly established law required his release, and at a minimum, what they should have done is question the fact that he continued to be detained and incarcerated behind bars. And there's no evidence that they did that. Mr. Werner wrote letters to everyone from his parole agent to the governor, including the parole agent's supervisors and their supervisors, explaining that what they were doing was illegal and unconstitutional. And to the extent they responded at all, they showed a total lack of concern for his plight. They made no attempt to grapple with his claims that this policy was unconstitutional. Instead, they indicated that they would be robotically applying the policy. In fact, in a couple of letters, it's worse than that. The DOC claimed that ADO 210 had been upheld by case law, and that's it. They cited no authority for that proposition, and we've not been able to find any. Who wrote that letter, and where do we find it? You'll find those letters at docket 113-1, pages 82 and 87. I forget the precise authors. I believe that they are the administrators, not the parole agents or their immediate supervisors. So that's the deliberate indifference. They had a choice. They should have at least questioned what they were doing, and there's no evidence that they did. And regardless, they were charged with following clearly established law. This saga served no peniological purpose. I will grant you that public safety continues to be a concern whenever a sex offender is released. And for that reason, I'll also grant you that they have to be monitored. But the DOC did not have to incarcerate Mr. Werner indefinitely for all but 20 hours a week to protect the public safety. And that is illustrated by their most recent directive dealing with homeless sex offenders, AD 15, AD 15-12, which replaced ADO 210. That's at short appendix 39. Under that directive, which is currently in place, sex offenders are not incarcerated, period, for being homeless. But they are tracked. They have to wear GPS devices. They have to frequently check in and report their whereabouts. And the DOC, in turn, has to check those reports against the GPS data. That's what they could have done here. Now, the state says, well, we needed a landline to operate the GPS. Two things about that. One, I question that. I question that based on a footnote, footnote 6, in State v. Dinkins, which is a Wisconsin Supreme Court case discussed in the briefs. And there, the state made the very same claim. It needed a landline to operate the GPS. After oral argument in that case, they submitted a letter stating, in fact, with individuals who lack a fixed address, they use cellular GPS trackers. So if that was true in mid-2008, when the offender in that case was released, there's nothing in the record to suggest why that would not have also been true in early 2010, when Mr. Warner was released. But if, in fact, a landline was required to operate the GPS, it appears only to have been for purposes of enforcing curfew. The GPS would be docked, and they could check curfew that way. But again, there's no reason they could not have done then what they do now to enforce curfew, which is require sex offenders to wear cellular GPS devices, to require them to frequently check in and report their whereabouts, and then to check those reports against the GPS data. So that is the Eighth Amendment analysis. And unless the Court has further questions about that, I'll move to the due process claim. You have no qualms that the Eighth Amendment analysis that we've been using is appropriate in a case like this? I do not. I think it's perfectly appropriate. The one question that I think is still open, Your Honor, is whether the three factors that are outlined in a case called Burke, which are borrowed from the Third Circuit, whether those govern the deliberate indifference analysis, and those three factors, just to remind the Court, are knowledge of the problem, failure to do something about it, and then causality, a relationship between the response to the problem and the unjustified detention. It's not clear whether that test applies in this circumstance, and I think it would be helpful if the Court could provide some guidance on that. But we do meet that test. There's no question they knew he had reached his mandatory release date that he thought entitled him to be released. There's no question they didn't do anything about it. In fact, they told him, no, we're going to continue to follow the policy, and that is exactly what led to his prolonged and unjustified detention. The reason I ask is we tend to be rather rigid, I think, in our lines of demarcation between the Due Process Clause and the Eighth Amendment with respect to the status of prisoners, and we really have an individual here who has a very unique status at that time in the law. He has served his period of incarceration. Should we really be considering him an incarcerated individual subject to the strictures of the Eighth Amendment, or should we be considering him to be a person who, very much like a pretrial confinee, who still is subject to some authority of the state, but whose rights really ought to be governed by procedural due process? Well, a couple of things about that. The Court... And perhaps substantive, for that matter. I think that the plaintiff in this case is somewhat in a unique position, and I think a unique posture in that regard, but nonetheless, he was incarcerated under DOC authority. I grant you that it was in a county jail, but the DOC signed his order of detention. That's at docket 113-1, page 96. So for all practical purposes, he was incarcerated by the DOC. If I could follow up a little bit, I'm inclined to agree that sometimes our doctrine can tie us up a little bit in this area. I wonder if he isn't usefully perceived as a parolee. If we go, for example, to the Supreme Court's fundamental case on due process rights of parolees, Morrissey v. Brewer, we find that if you suspect somebody has actually violated conditions of parole, he can be taken into custody. He's entitled to a prompt hearing. He's before a neutral decision maker, and so on. In this case, this fellow hadn't actually violated anything. This is under the policy, almost a precautionary detention. We'll put him in custody so he doesn't violate. He would seem to be denied even the rights of Morrissey. What I would say about that is I think it might be useful for you to look at the Wisconsin Supreme Court case of Reich, which we submitted as supplemental authority. The court there held that one can be both a prisoner and a parolee simultaneously, and I think that that would accurately describe Mr. Werner's status. The difference between that case and this one is that the offender in that case was recalcitrant. He refused to follow his rules of supervision. Mr. Werner did not refuse to follow his rules of supervision. He simply, as you correctly described, Judge Hamilton, was incarcerated largely through no fault of his own. Yes, he was a sex offender, but it was not his fault that he could not find a home. He was in parole status. I mean, he still was in the, broadly speaking, custody of the state. That's right. He still had time left on his sentence. The mandatory release statute requires release of prisoners at two-thirds of their sentence. That means a third is left to go, but they become parolees unless they continue to be incarcerated, which Mr. Werner was. I guess I'm trying to suggest he was factually a prisoner. He was legally a parolee. I think that is, yes, that's a fair statement. Correct. Mr. Paul, if it's a parolee, at least in part, I appreciate your argument that he's also a prisoner, but does that set it apart for the purposes of qualified immunity and knowledge of the state of the law from the cases that you cited, the Woods and Olson, where they were just prisoners? In other words, do we have a fact situation which would separate it on the question of the knowledge of the decision makers? Well, under qualified immunity doctrine, our case does not have to be on all fours with prior cases. I'm sure that's right. Yeah, and the court previously did not have to hold that the very act in question was unconstitutional. Closely analogous cases can clearly establish the law, too, and I really think that that's what we have here. We have a sex offender. We have someone who was transferred from one and under the authority of the DOC. Unless there are further questions, I reserve the remaining time for rebuttal. Mr. Paul, could I just ask you maybe one rebuttal to fill us in on the current status of the policy making defendants who have been in and out of the case? Okay, thank you. Thank you. Thank you, Mr. Paul. Ms. Keck-Habert? Good morning. May it please the court. I'm Wisconsin Assistant Attorney General Carla Keck-Habert, and I represent the defendants of Hallease who are several of Patrick Warner's former parole agents and their supervisors. The policy at issue in this appeal, ADO 2-10, authorized the defendants to hold certain sex offenders on a modified parole hold until they could find appropriate housing. The policy is no longer in existence, but when it was, it only applied to a narrow group of multiple offense sex offenders known as special bulletin notification, or SBN, sex offenders. Who gave them that designation? It's statutory. It's statutory? It is. According to the offense? Yes. I see. When there are multiple offense, certain types of multiple sex offenses are designated as special bulletin notification. Thank you. So we ask that this court affirm the decision of the district court because the defendants did not violate the Eighth Amendment or the Due Process Clause. Even if they did, they're entitled to qualified immunity. Qualified immunity protects all but the blatantly incompetent and those who knowingly violate the law. The defendants here in implementing the policy were not blatantly incompetent based on the situation with which they were confronted. Could we focus on the folks who wrote the policy? Sure. Particularly since the policy cites the relevant case law and even quotes, if I recall, the point that the cases require that prisoners be released upon reaching mandatory release whether or not an approved residence has been found. Well, first of all, with regard to the officials who were involved, presumably, in drafting this policy, they were screened out by the district court in the screening order and Mr. Warner did not appeal from that order and it was mentioned for the first time in reply. Who is the most senior defendant still in the case? Still in the case? Those would be the supervisors. I mean, I guess this court hasn't ruled that the case is moot as to injunctive relief yet, although you didn't ask us to brief that issue. So I think Ed Wall is probably still in the case but he was screened out, well he wasn't even a defendant at the time, but the former secretary was screened out for, as far as a personal involvement. What about Ms. Simden? She was screened out as well. They were allowed to, Warner was allowed to proceed against those defendants for injunctive relief only. So there was no personal capacity case against those defendants. So it would be Ed Wall, let's see, Gary Hamblin, Denise Simden, and Rose Snyder Smith. Those are all the upper level officials. So Mr. Warner was only allowed to proceed on a personal capacity case against his parole agents, Amanda Martin, Robert Fussfeld, and Aaron Murto, and their supervisors, Lori Riggles and Tom Wickeham. Talking about qualified immunity and the statute, or the policy itself, the policy does mention those state court cases, but those cases do not clearly establish a violation because the offender was held beyond his MR date in prison. He wasn't released to parole. From his perspective, what's the difference? The difference is he was transferred from the Red Granite Correctional Institution, moved back home to Green Bay. He was on parole at the time. He's in custody 148 hours a week, right? It's something like that. It's true that he was only released... He's an inmate, 148 hours a week. He is, but he's on parole status, and he is released for a good part of the day to search for housing. Okay, I've got to say, your briefs seem to present this as if the county jail was sort of like a youth hostel, where he gets a bunk to sleep at night. That's probably... But this doesn't seem remotely comparable to the reality of what he was experiencing. It's probably not accurate that it was like a youth hostel, but it was the only option that the defendants had at the time. They needed a place for him to stay. No, it was not. They could have complied with Wisconsin law, which prohibits detention simply because he's homeless. One of the laws that opposing counsel cites is the sex offender registry law, and that is completely different than the strict supervision that offenders are under when they're on parole or extended supervision. It's like comparing apples and oranges. There's the registry requirement where you're just required to report certain things, and then there's the strict supervision that SPN sex offenders were under when they were released to parole. Offenders had strict rules of supervision. They had weekly reporting requirements. They had curfews and had to provide an itinerary every time they went out. They often needed a chaperone, so it was very similar to the time that they were out under the policy. It wasn't continual incarceration. I'm trying to figure out how somebody in the policymaking position, and presumably seeking advice from your office, could read Woods, Olson, and later Allen, and conclude, well as long as we just put him in the county jail instead of the state prison, we can just treat him the same way. Well, I think here, this goes to the qualified immunity point. In State Exeral Olson v. Litcher, the Wisconsin Court of Appeals expressly invited DOC to find a way to more closely monitor sex offenders, and didn't say what that way was. And ADO 2-10 is the policy that DOC came up with in order to more closely monitor sex offenders. Is there any record of legal analysis that supports the distinction you're drawing in the development of that policy? Does DOC have a record of that, or? Yes. Not that I know of. I assume it's not in the district court record here. It's not. Although, I think the fact that DOC expressly put in the policy the cases of Woods and Olson shows that they were making an attempt here to find a way to more closely monitor sex offenders. Turning to the Eighth Amendment claim, if this court thinks that that analysis is proper, the defendants here had a legitimate penological reason for holding sex offenders on a modified parole hold, and that reason was public safety. Sex offenders have a very high rate of recidivism, and especially multiple offense sex offenders have a very high rate of recidivism. So because of this high rate of recidivism, they had to be on close supervision when they were on parole, and at the time, that required obtaining and maintaining an approved residence. Another reason that offenders... Improved residence requirements for people under this special category of multiple sex offenders, was that different than for other sex offenders? I'm not entirely sure if the actual residency requirement was. I mean, these sex offenders, the SBN sex offenders had to have a residence at the time, whereas other sex offenders on active supervision, non-single offense sex offenders, could be released as homeless at the time. So DOC made a policy decision that the SBN sex offenders needed to have an approved residence. That was an administrative decision or a statutory decision? That was administrative. That was administrative. And reconciled that requirement for me with the language in the opinions and in the policy itself that prisoners be released upon reaching mandatory release whether or not an approved residence has been found. The Olson court was very clear about that. That's true, but the defendants were acting under the facts that they had before them at the time. No, they weren't. I haven't heard an explanation yet for how you can do this. Well, I think it goes to qualified immunity. These defendants, certainly these line officers didn't know, couldn't have reasonably known that this would be unlawful. They thought they were following a policy based on... That's the problem. They were following a policy. The problem is the policy. Well, that may be, with all due respect... I wonder if we need to revisit the screening order since we've got an entire final judgment in front of us. Well, even if the court revisits the screening order, the upper level officers' actions weren't deliberately indifferent for the same reason as these line officers. There was a legitimate penological reason for placing these offenders on a hold, and they weren't deliberately indifferent. Legitimate penological reasons, we may be dealing with kind of the edge between due process of law and the Eighth Amendment. I understand that there are perfectly good reasons to be concerned, and that's why these monitoring requirements are in place. But in our system of government, the executive branch is usually not allowed to make a unilateral decision that somebody presents a danger to the public and therefore must be held in custody. Right? That's probably true, although they had... You want to give me an exception to that? Ample statistics here. They were based on... Do you want to give me an exception to situations where the executive branch can unilaterally hold somebody in custody? I can't think of one, no. But these are parole officers. This isn't Guantanamo Bay. No, but they were charged with the responsibility of safely supervising these sex offenders who've been shown to be especially dangerous. And the policy makers and the line officers acted reasonably given that situation. The defendants were also not deliberately indifferent. This policy allowed offenders to be released from prison under those state cases. It provided them with a place to stay. This was the only option for them. This was the only place that they had for him to stay that was within the ordinances, which were extremely restrictive. And it also allowed them to avoid a violation of their rules of supervision, which at the time included a provision that they couldn't violate municipal ordinances and this residency requirement. As I mentioned, in the state XREL Olson v. Litcher, the court invited DOC to find a way to more closely monitor sex offenders. And this is the policy. This is what they came up with. That also leads to the conclusion that they're not deliberately indifferent. They followed what they thought was this directive from the court. The supervision when they were on the policy was less restrictive than it would have been if they were continually held in prison. They were released for several hours during the day, and the time frame was based on jail policy. They had to comply with jail policy because, as I mentioned, the jail was the only place that they had for them to stay. Could you compare those releases to those of the furloughs in the Woods opinion? Since those Court of Appeals from Wisconsin told us in Woods that those furloughs with I think there are a couple of differences. First of all, the offender in that case was not placed on parole, was never released to parole. That's a label. What a practical difference between the furloughs in Woods and here. As far as I know from the record of the Woods case, it wasn't for a certain amount of time each day that the person was released. And there aren't details about exactly what happened during that time. But here they were released every day, every weekday for four hours to search for housing and do a number of other things. Run errands with their chaperone, search for jobs, that kind of thing. Turning to the procedural due process claim, there's no question that Werner was notified of the reason for his detention every time he was released from prison. He also had an opportunity to use the prison grievance system to challenge both the decision that he was homeless and the residency requirement of his rules of supervision. Is there any evidence to back that up? As you recall, the plaintiff points out in his brief that the regulation on the grievance process excludes detention and custody decisions. That's correct. However, Patrick Werner did challenge the policy itself, which is my understanding what opposing counsel is arguing he was entitled to do. Was he heard? He was. Did he get a response? He got a response every time from the defendants. Does the grievance procedure authorize a decision to release somebody from custody? Does the person considering the grievance have authority to do that? To release someone from custody? Based on a grievance. I do not think so. No. But it does allow the offender to challenge all of the decisions underlying his detention. And here, Werner complained about... So if he challenges those decisions and prevails, he should be released, right? No. But that's not what the grievance procedure is for, is it? That's correct. So why are you telling us that the grievance procedure is a remedy here for custody and detention? Well, he had a process. He had a process that he could go through. He just didn't get the relief that he wanted here. And again, for qualified immunity purposes, the Metcalf decision, I think, is on point here. Metcalf has dealt with a different kind of problem. Here, it's a challenge to the whole policy, the requirement that he have housing, not that particular residences were unsuitable. But in Metcalf, the district court held that the defendants were entitled to qualified immunity because whether an offender was entitled to more or different process was novel. And here, Werner is asking for more or different process than what was already provided. Let me go back to my questions to Mr. Paul about the Morrissey case. He's, in essence, legally on parole. You're telling us he's no longer a prisoner, even though it must have felt awfully much like he was still a prisoner. So Morrissey tells us that somebody who is suspected of violating parole conditions is entitled to various procedural protections, including an independent hearing officer. In the federal system, we have the elaborate procedures codified by both statute and Rule 32.1. There's nothing remotely like that here, is there? As far as process, no. They did not go through the process that he was entitled to. So on what basis could you conclude that due process was being accorded to somebody who's being kept in prison, essentially in custody, 148 hours a week, on the say-so of only executive authority, with no access to the courts? Well, as far as the process that Mr. Werner was permitted to have, it was a written grievance system, which this court in Tony L. said was sufficient for an offender being held beyond his mandatory release date. So I think that process was sufficient in this circumstance rather than through the whole revocation process, because here there's no question that Patrick Werner's parole was not going to be revoked because of any action on his part. They were just in this unusual situation where they had no other place to put him. And he had to be confined in the jail at night and then released for a good part of the day to search for housing. This was the only option that they had at the time, given their decision that this offender was a dangerous offender that could not be released. And I think, too, that exact issue was addressed in Medcalf, where the offender there wanted to have the procedures under Morrisey, but the court held no, that he wasn't entitled to those procedures. He was only entitled to the written grievance system that he already had. And if there was some entitlement to more process, that was a new, and had not been decided by any court. So the defendants in that case were entitled to qualified immunity, as they should be here. And the supplemental authority that opposing counsel cites, Reisch v. Schwartz, in that case the court held that an offender can attain the status of a parolee while he's continually incarcerated. And that holding actually supports the state's position. Opposing counsel cites to just one sentence in dicta, where the court said it's mindful that the DOC is not free to hold inmates indefinitely for such problems as failure to find suitable housing on its part. This one sentence in dicta cannot clearly establish a violation on the part of the state defendants. So it's important to remember here that Patrick Warner was twice convicted of a child sex offense, and that's what makes him a Special Bulletin Notification or SBN sex offender. The defendants did not hold him on a modified parole hold in order to punish him. They did it for public safety. And he had an opportunity to challenge both of the decisions underlying his detention. So even if the defendants violated the Eighth Amendment or the Due Process Clause, they're entitled to qualified immunity because no case clearly establishes that their actions in detaining Mr. Warner on a modified parole hold were unconstitutional. So based either on the merits or on qualified immunity, we ask that this court affirm the decision of the district court. Thank you, Mr. O'Connor. Any further? Mr. Paul. I'd like to begin by addressing Judge Hamilton's question about the status of the policymaking officials. State's counsel accurately describes the screening order. However, we did appeal that order. Mr. Warner appealed from the judgment, and of course, as you know, that brings up all interlocutory orders for review. And we argue specifically under this court's case in Childress, decided last year, that these individuals could be held responsible and administrators can be held responsible for these sorts of things when they have instituted, condoned, or willfully turned a blind eye to a policy or practice that, when enforced, causes a constitutional violation. And we believe that that's precisely what happened here. I think an appropriate remedy as to those individuals would be to reverse and to remand for further proceedings on those individuals. Mr. Paul, does the record reflect any legislative action post the Woods and Olson decisions in the early 2000s? With respect to what specifically? Well, to a policy such as... How soon after those cases did the policy come into being? The Woods case was decided in 1999, Olson in 2000, and the policy was implemented in July of 2002. So do we have anything to indicate whether the legislature took any action? In response to the policy? Or the cases? I'm not aware that they did specifically. No, Your Honor. So what we have is an invitation from the Intermediate Appellate Court in Wisconsin to develop a policy. Not that they should be invited to do an unconstitutional policy. Yes, of course. Really, it was an invitation, I think, to the DOC to handle these people appropriately and not to incarcerate them. And there would have been a number of other options involving more intensive supervision without custody, right? Unquestionably, and Administrative Directive 1512, again at 39 of the Short Appendix, proves that point perfectly. Homeless sex offenders are not detained, but they are monitored. They have to frequently check in and report their whereabouts, and those reports are double-checked by the DOC against the GPS data. They could have done that in 2010, and for whatever reason chose not to. The state, by virtue of the mandatory release statute, has made the judgment that whatever peniological purposes are served by putting someone behind bars, that those purposes are sufficiently fulfilled once they reach two-thirds of their sentence, that they must be released. And that goes as much for SBN offenders as it goes for other types of offenders. The Administrative Directive 1512 really puts the lie to the state's claim that they had no other option here. They did have options, and AD 1512 was that option. If there are no further questions, I would ask the Court to reverse. Thank you. Mr. Paul, thanks to all counsel. Mr. Paul, you accepted this appointment in the case, so you have the additional thanks to the Court for your able representation. Thank you.